IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STOUT & COMPANY, LLC,

     Plaintiff,

v.                                           Case No. 2:15-cv-09323-JTM

CITY OF BEL AIRE, KANSAS,

     Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Stout & Company brought this action for declaratory, injunctive, and other relief pursuant to the Federal Telecommunication Act of 1996 ("TCA"). The suit concerns the City of Bel Aire's denial of Stout's application for a special use permit to construct a cell phone tower on a site in Bel Aire.  Stout contends the denial violated the TCA for several reasons, including because the decision was not supported by substantial evidence. Bel Aire contends it complied with the Act. The matter is now before the court on the parties' cross-motions for summary judgment. For the reasons discussed herein, Stout's motion for summary judgment is denied and Bel Aire's motion is granted.

**I. Telecommunications Act.**

The Federal Telecommunications Act of 1996 (TCA), 47 U.S.C. § 332, limits the authority of local governing bodies regarding the placement of wireless communication facilities, including cell phone towers.  *T-Mobile Central, LLC v. Unif. Gov't. of Wyandotte Cnty., Kansas City, Kan.*, 546 F.3d 1299, 1306 (10th Cir. 2008). Congress adopted the TCA

to promote competition and higher quality in telecommunications services, and to encourage rapid development of new technologies. *Id*. The TCA furthers these goals by reducing the impediments that local governments can impose to defeat or delay installation of wireless communications facilities. *Id*.

The TCA generally preserves the traditional authority of state and local governments to regulate the location, construction, and modification of wireless communications facilities like cell phone towers, but it imposes specific limits on that authority. *T-Mobile South, LLC v. City of Roswell, Ga.*, 135 S.Ct. 808, 814 (2015). Among other things, any decision of a state or local government to deny a request to construct such a facility must "be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Other limitations include a prohibition on regulating the construction of such facilities on the basis of the environmental effects of radio frequency emissions. § 332(c)(7)(B)(iv). The Act also bans state or local regulations that prohibit or have the effect of prohibiting the provision of personal wireless services. § 332(c)(7)(B)(i)(II). Aside from these and a few other limitations, however, nothing in the TCA "shall limit or affect the authority of a State or local government … over decisions regarding the placement [or] construction … of personal wireless service facilities." § 332(c)(7)(A).

**II. Uncontroverted Facts**.

Stout & Company is a Mississippi company registered to do business in Kansas. It constructs wireless telecommunication facilities and leases them to providers such as T-Mobile and others who provide wireless telecommunication services to the public.

Stout's tenants, including T-Mobile in this case, hold licenses from the FCC to provide wireless telecommunication services in Bel Aire, Kansas.

Wireless communications systems rely on a network of wireless facilities known as wireless communication facilities ("WCFs"). WCFs are comprised of radio antennas and other equipment that receive and transmit low-power radio signals to and from mobile wireless handsets, thereby facilitating wireless communications. For the system to function without gaps in signal coverage, the WCFs must be properly located, installed, and functioning. To maintain effective service, there must be a continuous interconnected series of WCFs.

The antennas must be located on structures of sufficient height, such as communication towers, to transmit and receive radio signals. Where no such structures exist, new towers may be needed. A WCF must be located within a specific area so that it can provide line-of-sight communications with wireless devices and properly interact with other WCFs, handing off communications from one WCT to another as mobile users travel through the area. Each WCF has a limited coverage area, which varies depending on antenna height, local topography, existing structures, and population densities. A coverage gap exists when a carrier has no functioning WCF in a given area, meaning wireless customers may experience failed call attempts, busy signals, dropped calls, busy signals, and lack of data transmission.

On July 21, 2015, CLS Group, Inc. (CLS), on behalf of Stout, submitted an application for a special use permit to construct a WCF tower on a 100 foot by 100 foot parcel of land in Bel Aire. Prior to submitting its application, Stout  did  a  study  to

determine the best location for a cell tower. Stout asserts that "radio frequency engineers determined that a significant 'gap' in wireless coverage for T-Mobile existed in and around certain areas of Bel Aire," and that Stout's proposed WCF "correct[s] the significant gap in wireless signal coverage in the area of Bel Aire." In support of these assertions, Stout cites only the affidavit of its member Guy Stout. Bel Aire objects to these assertions, arguing they are conclusory and amount to hearsay. The court agrees. Stout's assertions are entirely conclusory, with no showing made as to the source or basis of the underlying facts or of Stout's knowledge. Stout points to nothing in the record to show or explain the asserted gap in coverage in "certain areas" of Bel Aire. Elsewhere, Stout points to propagation maps which allegedly show a coverage gap, but the maps are unaccompanied by any explanation or analysis of the results. In sum, Stout points to no competent evidence in the record establishing a coverage gap – or its significance - in Bel Aire.

Bel Aire zoning regulations require that an applicant for the construction of a WCF include an affidavit attesting to the following:

> 1. That the applicant made diligent efforts to install or co-locate on existing wireless telecommunication facilities or antenna support structures within the proposed service area.
> 2. That the fees, cost or contractual provisions required by the structure owner(s) of other wireless telecommunications facilities or antenna support structures within the proposed service area are unreasonable.
> 3. That other limiting factors render the use of other wireless telecommunications facilities and antenna support structures within the proposed service area unsuitable.

Stout's application did not include an affidavit attesting to the above factors. Prior to submitting its application, Stout examined existing towers and structures in the

area as potential colocation sites, which would have minimized the cost of construction and conformed to zoning preferences. A search of a quarter-mile radius around the proposed site identified the city's water tower, which is 170 feet in height. Stout stated in the "Justification Statement" in support of its application that "No towers or structures within a ½ mile [were] viable for colocation." Stout represented in the application that the water tower was not suitable because any tower lower than 178 feet "would not allow for the lower parts of the tower to be marketed for colocation," while a 178-foot tower "will allow the lowest RAD center" to be at 144 feet. (Dkt. 18-3 at 28). Stout's application did not further explain these assertions. It did not address whether the water tower could be used to install a WCF capable of addressing the alleged gap in T-Mobile coverage. It also did not explain why the use of a stealth design was not proposed, Stout's representative later told the city council that a stealth design can significantly increase the cost of a tower. Bel Aire's zoning regulations define a "stealth monopole" as one that is 50 feet or less in height.

Stout submitted a propagation map showing a search ring indicating the coverage that would be present if the tower went "on-air." The proposed site is designed to support multiple wireless carriers and operate a non-exclusive infrastructure for all carriers.

The proposed site is zoned "R-4," which is a single family residential district. Property zoned as R-4 is intended for residential development with a minimum of 8,400 square foot lots in areas where adequate public facilities and services exist, and residential development is appropriate given the surrounding land uses and

neighborhood. Bel Aire's zoning ordinances provide that any building or structure on an R-4 lot must conform to certain uses and height limitations. A single family residence must not exceed 35 feet in height from finished grade.

The property on which the proposed site is located is owned by Robert D. Linsted and Sharon E. Linsted. The Linsteds leased the proposed site to Stout to construct and operate the proposed tower. The site is immediately adjacent to other real property owned by the Linsteds and to the City of Bel Aire Recreational Complex. The Recreation Complex is classified as a park. Two properties owned by the Linsteds are to the southeast and southwest of the proposed site. To the southeast are multiple buildings that comprise Sunrise Christian Academy ("Sunrise"), owned by the Linsteds. To the north is the Bel Aire Recreation Complex, owned by Bel Aire, which has at least five baseball diamonds and a recreation facility. Other than the nearby residential properties owned by the Linsteds, the nearest residences to the proposed site are located 645 feet to the east, 730 feet to the west, 820 feet to the south, and 1,120 feet to the north. There are approximately 143 residential homes to the east of the proposed site, 79 homes to the south, and 55 homes to the west.

The construction and operation of wireless telecommunications facilities is a permitted conditional use within an area zoned as C-1. The nearest property to the proposed site that is zoned C-1 is ¾ miles to the north, ½ mile to the east, ¾ miles to the south, and ¼ mile to the west.

Hedgerows provide some natural screening at the proposed site, although the WCF would still be visible from some vantage points. Similarly, trees or buildings might obscure a part of the WCF from some vantage points.

Bel Aire's zoning regulations provide for consideration of the following factors by the city council on applications for zoning changes:

1. the character of the neighborhood;
2. the zoning and uses of properties nearby;
3. the suitability of the subject property for the uses to which it has been restricted;
4. the extent to which removal of the restrictions will detrimentally affect nearby property;
5. the length of time the subject property has remained vacant as zoned;
6. the relative gain to the public health, safety and welfare by the destruction of the value of petitioner's property as compared to the hardship imposed upon the individual landowners;
7. recommendations of permanent staff; and
8. conformance of the requested change to the adopted or recognized master plan being utilized by the city.
9. the opinions of other property owners may be considered as one element of a decision in regard to the amendment associated with a single property, however, a decision either in support of or against any such rezoning may not be based upon a plebiscite of the neighbors.

Bel Aire Zoning Regulations Art. 5, Sec. 5.01(E), Dkt. 17-6 at 48.

Bel Aire's Wireless Telecommunications Facilities Siting Regulations are located at Section 8.08 of the city code. Under those regulations, a tower (and related telecommunication facilities) is permitted by administrative approval or by special use permit, whichever is applicable, in all zoning districts. An application for special use permit must be approved by the Governing Body. The regulations acknowledge that an application for special use permit may be made in a residential district.

Bel Aire's siting regulations for wireless telecommunications facilities have the following standards for evaluation of special use permit applications:

b. Standards for evaluation of special use permit applications. The planning commission may approve, deny, or approve with conditions an application for a special use permit in any zoning district after review and consideration of all of the following, and such review shall be documented with the special use recommendation form:
i. Conformity with the city's comprehensive plan;
ii. Compatibility with abutting property and surrounding land uses;
iii. Adverse impacts on the visual, environmental, or safety impacts;
iv. Color and finish of the proposed facilities;
v. Screening potential of existing vegetation, structures and topographic features;
vi. Potential for adequate screening of proposed facilities;
vii. Scale of facilities in relation to surrounding land uses;
viii. Impact on entry corridors into the city;
ix. Impact on landmark structures, historically or architecturally significant structures or districts, or environmentally sensitive areas;
x. Impact upon established easements;
xi. History of land use of property, including but not limited to: existing nuisance code violations, failure of property owner to abide by nuisance, health and safety, building or zoning codes, failure of property owner to enforce codes upon subject property when property occupied by a tenant, and documentation that property is currently subject to abandonment or foreclosure action;
xii. Property owner entering into abandonment agreement, which will be filed with the register of deeds and run with the property.

Dkt. 17-6 at 124-25.

There are no specific criteria in the code for evaluating or giving preferential treatment to an application for a tower on public, as opposed to private, property.

One objective of Bel Aire's Comprehensive Development Plan is the development of a visually pleasing community character. In order to minimize adverse visual impact from cell phone towers, the zoning regulations encourage the use of camouflaging and other stealth designs "as applicable to the type of

8

telecommunications structure and character of the location." The Plan also seeks to maximize revenue from land use development by avoiding negative impacts on the quality of residential life and by ensuring that development occurs in an orderly fashion near a suitable location and with similarly established land uses.

The Bel Aire Zoning Administrator approved Stout's application for special use permit, with comments to the Planning Commission. The Administrator's report listed numerous points for review and included nine items as to which Stout needed to take further action or provide further information.

Notice of a public hearing to consider the application was provided pursuant to the code. On August 13, 2015, the City's Planning and Zoning Commission held a public hearing and recommended approval of the application by a vote of 4 to 2.

The Bel Aire City Council considered the application at a regularly-scheduled meeting on September 1, 2015. Mayor David Austin was present, as were city council members Ramona Becker, Ken Lee, Guy MacDonald, Betty Martine, and Peggy O'Donnell.  Reagon Hicks, a representative of CLS Group, spoke on behalf of Stout. Hicks gave a power-point presentation that included aerial photos, photo simulations, and coverage maps.

Gary O'Neal, a Bel Aire resident, spoke at the September 1 meeting and opposed the special use permit due to the height of the proposed tower, the type of construction, and the lack of any camouflaging to minimize the visual impact.

During the September 1st meeting, council member MacDonald questioned why the tower could not be located on city property. Council member Becker said she felt

that any profit from the tower should go to all Bel Aire citizens, not to just one homeowner, given that all residents would be burdened by the sight of the tower. She said "that would be on City property," and asked why city property was not considered. She also inquired about who got the income from the tower and how much it would be. She inquired about the possibility of locating the tower on the city-owned property to the north of the proposed site. Hicks represented that the location for the tower was determined by a study of where additional cell phone coverage was needed. Becker also noted concerns about development that would create a negative impact on residential life, stating that the site was "right in the middle of a neighborhood," and "people … don't like to be under a big tower like that" and "don't like to look at it when they drive down the street." The city council ultimately voted at the September 1st meeting to table the application until the regularly scheduled meeting on September 15, 2015, and to have a workshop just prior to the meeting to obtain more information.

On September 11, 2015, City Manager Ty Lasher emailed Hicks several questions posed by council member Becker, including:

> What methodology was used to choose this exact spot for this tower?
> Why were no other locations in Bel Aire considered?
> Does the monthly income from the cell companies go to the "Landlord" or the tower company?
> Does he [CLS or Stout] anticipate that the cell providers on the city of Bel Aire water tower might want to move to his tower?
> Where are the 3 closest T-Mobile towers to Bel Aire?
> If this tower would be approved what would be the best type of camouflage to lessen the impact on the integrity of the neighborhood?

On September 15, 2015, the city council held a workshop for the purpose of discussing the application. It held its regular meeting immediately after the workshop and again considered the application. Only one citizen, Helen Duncan, voiced her opposition to the application during the public comment section of the September 15 meeting, stating her belief that it would decrease her home's value. The council ultimately denied the application by a vote of 3 to 2, with Becker, MacDonald, and Martine voting to deny it.

On October 8, 2015, Stout's attorney, Curtis Holland, called City Attorney Alison McKenny Brown to request that Stout be provided with written reasons for the denial, as required by the TCA. He also requested video recordings of the September 1st and 15th meetings. That same day, Brown emailed Holland a red-lined, draft version of the minutes of the September 15th meeting, which had been prepared by City Clerk Jamie Hayes. Brown's email stated:

> Attached is the redlined version of the DRAFT minutes of the September 15, 2015 city council minutes, complete as of October 8, 2015. These minutes are scheduled to be distributed to the city council for review and approval at the October 20th meeting. Typically draft minutes are not publicly distributed, but as the City is unable to provide a copy of the video of the meeting and there are no finalized minutes of the meeting at this time, the draft minutes are being made available. The written justification for the action of the majority is as stated by the City Attorney within the draft minutes and is not anticipated to be corrected by the council during the review and approval process. Please understand that the adopted minutes reflect the perceptions of the city council as to the actions of the city council, draft minutes only reflect staff perceptions of the meeting.

The following day, Brown emailed Holland, stating that she believed the minutes of the city council meeting could qualify as the formal written decision required by the

TCA, although "the minutes should be adopted so as to assure that [they] accurately reflect the council's decision." Brown indicated she would forward the approved minutes when she had them.

The draft minutes included a comment that the reasons given by council members in opposition to the application were not verbatim as "the council meeting was not recorded due to technical difficulties." Bel Aire normally records the council's meetings and workshops. The draft minutes contained black-font type showing the staff's perception of the reasons given by Becker, Martine, and MacDonald for denying the application. The minutes contained red-line font showing additional reasons for denial provided by Martine and MacDonald.

At the council's meeting on October 6, 2015, members disagreed over the contents of the proposed minutes from the September 15th meeting. Several members voiced concern that the draft did not fully and accurately explain the rationale for their votes against the application. As a result, approval of the minutes was tabled until the council's next meeting on October 20, 2015.

On October 15, 2015, thirty days after the city council's denial of the application, Stout filed this lawsuit. As of that time, the city council still had not approved minutes for the September 15th meeting. It finally approved the minutes on October 20, 2015. The approved minutes contain various reasons for denying the application from the three council members who voted against it – MacDonald, Becker, and Martine. The various reasons will be discussed *infra* in the court's discussion of whether the decision was supported by substantial evidence.

The approved minutes reflect that prior to the final vote, the City Attorney handed a copy of Article 5, Section 5.01(E) to the council members for review and, after the vote, the attorney requested clarification that specific provisions of the zoning code were the grounds for the majority vote denying the application. The City Attorney read the following criteria out loud:

1. the character of the neighborhood;
2. the zoning and uses of the property nearby;
4. the extent to which removal of the restrictions will detrimentally affect nearby property;
9. the opinions of other property owners may be considered as one element of a decision in regard to the amendment associated with a single property, however, a decision either in support of or against any such rezoning may not be based upon a plebiscite of the neighbors.

The minutes reflect that Becker, Martine, and MacDonald "all verbally agreed that those provisions of the Bel Aire Zoning Code were the basis for their decision on this matter." The city council's denial of the application is a final action and is subject to appeal.

### III. Summary Judgment Standards.

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed.R.Civ.P. 56(a). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

**IV. Discussion.**

Stout's complaint alleges three violations of the TCA: 1) Bel Aire failed to provide written reasons for the denial essentially contemporaneously with its decision; 2) Bel Aire's denial was not supported by substantial evidence; and 3) the denial effectively prohibits the provision of personal wireless services. Stout seeks summary judgment on all three claims and argues that the appropriate remedy as to each claim is an order directing Bel Aire to approve Stout's application. Dkt. 24 at 56. Bel Aire seeks a summary judgment finding that its denial of the application was proper under the TCA.

1. <u>Contemporaneous written reasons</u>.   Section 332(c)(7)(B)(iii) of the TCA requires a municipality to give written reasons when it denies an application to build a cell phone tower. *T-Mobile South, LLC v. City of Roswell, Ga.*, 135 S.Ct. 808, 814 (2015). The reasons do not have to appear in the same writing that conveys the denial. *Id*. at 816. Nor does the TCA require any specific format. Detailed minutes of a city council meeting may be sufficient. *Id*.  An explanation is considered sufficient if the reasons are stated clearly enough to provide judicial review. *Id*.

A city cannot stymie or burden the judicial review contemplated by the statute by delaying the release of its reasons for a substantial time after the denial. Because the TCA gives an applicant 30 days after denial to seek judicial review, and the applicant may not be able to make a considered decision whether to seek review without

knowing the reasons for the denial, a city must provide or make available its written reasons "at essentially the same time as it communicates its denial." *Id*. at 816.

Under the standards of *T-Mobile South*, Bel Aire failed to provide its written reasons contemporaneously with the denial of Stout's application. In fact, it did not provide the reasons until after Stout's time to file for judicial review had passed. The draft minutes of the city council's September 15th meeting, which were given to Stout on or about October 8, 2015, did not meet Bel Aire's obligation under the TCA. The City Attorney emailed a "DRAFT" [capitals in original] of the minutes with a caveat that they were not yet approved and were subject to being "corrected" by the city council. The record shows minutes were typically drafted by city staff members and were not considered official or final until they were approved by the city council. Stout could hardly be expected to make a "considered decision" on whether to appeal until Bel Aire took an official position on its reasons for the denial. The failure to do so essentially contemporaneously with the denial of the application violated the TCA.

The TCA does not provide a statutory remedy for a violation of its provisions, although it is well established that "injunctive relief is an appropriate remedy for violations of [the TCA's procedural requirements.]" *U.S. Cellular Corp. v. Bd. of Adjustment of City of Seminole, Okla.*, 180 Fed.App'x 791, 2006 WL 1288596 (10th Cir. 2006) (citation omitted). Whether to grant equitable relief under the TCA is a matter left to the discretion of the trial court. *Id*. at 794 (*citing Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1219 (11th Cir. 2002)). A fundamental principle of injunctive relief is that it is not available when the aggrieved party has an adequate remedy at law. *See Younger*

15

*v. Harris*, 401 U.S. 37, 43-44 (1971) (noting the "basic doctrine of equity jurisprudence that courts of equity should not act … when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."). In this instance, Stout has an adequate legal remedy. The purpose of the TCA's requirement for contemporaneous reasons is to afford the aggrieved party an adequate opportunity to seek judicial review. In this instance, Stout had the foresight to file suit within the 30-day statutory window, and Bel Aire provided its reasons shortly thereafter, such that Stout's right to judicial review has been adequately preserved and it has suffered no irreparable harm from the violation. Under the circumstances, the court concludes that Stout is not entitled to injunctive relief on this claim. *Cf. Verizon Wireless LLC v. Douglas Cnty. Ks. Bd. of Cnty. Comm'rs*, 2008 WL 298774, *1 (D. Kan., Feb. 1, 2008) (appropriate remedy where county failed to provide reasons was to order it to provide the reasons within twenty days).

2. <u>Substantial evidence</u>.  Stout next contends that the city council's denial of its application was not based on substantial evidence. It argues the decision was not grounded on criteria in the zoning regulations, that the real reason was because two council members wanted the tower to be on city property, and that the council considered improper factors such as a plebiscite of the neighborhood.  Stout contends the various reasons cited by the city council for denying its application were not supported by substantial evidence.

Under 47 U.S.C. § 332(c)(7)(B)(iii), any decision by a city to deny a request to construct a WCF must be supported by substantial evidence. Substantial evidence

means evidence which "a reasonable mind might accept as adequate to support the conclusion." *T-Mobile Central*, 546 F.3d at 1307. It "requires more than a scintilla but less than a preponderance." *Id.* (citations omitted). The substantial evidence standard does not create a substantive federal limitation on local land use regulatory power. *Id.* Rather, the inquiry depends upon state and local law, with the court looking to the local zoning law for the substantive criteria to be applied and determining whether substantial evidence existed to support the city's decision. *Id.* (*citing U.S. Cellular Telephone of Greater Tulsa, LLC, v. City of Broken Arrow, Okla.*, 340 F.3d 1122, (10th Cir. 2003)).

Council member MacDonald cited several reasons for denying the application, including that the proposed site was a long-established R-4 single family dwelling neighborhood, that construction of a commercial cell tower in that location would significantly change the character of the neighborhood, and that 13 of 14 nearby property owners indicated opposition to the proposed site when surveyed. The first two factors were clearly proper considerations under Bel Aire's zoning regulations. Section 5.01(E) of the city code governing zoning changes directed the council to consider (among other things) the character of the neighborhood and the zoning and uses of property nearby. Similarly, Bel Aire's regulation on WCF special use permits directed the council to consider conformity with the comprehensive plan, compatibility with abutting property and surrounding land uses, and the history of the land use of the property, among other factors. *See* Dkt. 17-6 (Zoning Regulations, Ch. 18, Sec. 8.08(G)(3)(b)). The first two factors cited by MacDonald were therefore valid

considerations. Moreover, there was substantial evidence to support the council's conclusion that these factors weighed against approval of the permit. There was evidence that the proposed site is in the middle of a residential neighborhood, with single family homes a short distance away in two directions, a school and homes in a third direction, and a park with baseball diamonds in the fourth direction. The council could conclude from the evidence that a 170-foot tower in this location would be visible to a significant number of homes in the immediate area and would have an adverse impact on the character of the residential neighborhood. While Stout is undoubtedly correct that "generalized aesthetic concerns" do not suffice as substantial evidence under the TCA, evidence of the negative visual impact of a partially unscreened 170-foot tower in the middle of a residential neighborhood in a small community – including public comments critical of the visual impact, a neighborhood survey showing opposition based on visual impact, and a photo simulation showing the visual impact - is specific and substantial enough to be considered as a legitimate factor in the zoning determination. *Cf. T-Mobile Central*, 546 F.3d at 1312 ((a "photo simulation, in the absence of concerns grounded in the specifics of this case (such as beautification efforts, neighbor complaints, the actual character of the immediate neighborhood, etc.) does not constitute substantial evidence")). Nothing in the TCA required the city council to cast aside its common sense in evaluating the visual impact of a galvanized tower rising five times the height of surrounding homes in the midst of a residential neighborhood. *Id.* at 1313 (noting the neighborhood in that case was largely commercial).

The third factor cited by MacDonald, as well as by other council members, was an informal survey of neighbors in which most of those questioned indicated opposition to the tower. Stout contends consideration of this information contradicted Section 5.01(E) of the regulations, which states in part that "a decision either in support of or against any … rezoning may not be based on a plebiscite of the neighbors." Stout's argument, however, ignores the first part of the same provision, which states that "the opinions of other property owners may be considered as one element of a decision in regard to the amendment associated with a single property…." Stout fails to adequately reconcile the two provisions. Considering both portions together, the regulation can be construed as prohibiting zoning decisions based *solely* on expressions of local public support or opposition, or barring the making a zoning decision by putting it to a vote of the community. *See Taco Bell v. City of Mission*, 234 Kan. 879, 678 P.2d 133, 143 (1984) ("Zoning is not to be based upon a plebiscite of the neighbors, and *although their wishes are to be considered*, the final ruling is to be governed by consideration of the benefit or harm involved to the community at large.") (emphasis added; cite omitted). Either way, the city council's consideration of a survey of neighboring property owners as one factor in a zoning decision affecting a single property does not appear to violate Section 5.01(E). Stout goes on to suggest that the survey should have been disregarded due to questions about the way it was conducted or because it occurred outside of the public hearing. But the survey results were a part of the written record of the public hearing, and Stout identifies no legal basis for excluding them. Of course, Stout was free to

present its own evidence of neighborhood opinion for the council's consideration. In sum, Stout has shown no impropriety in the council's consideration of the survey.

Council member Becker identified at least seven reasons for her vote against the application. Three of those are the ones listed above, which the court has already found to be based upon the Bel Aire city code and supported by substantial evidence. A fourth factor was the less-than-unanimous vote of the Planning Commission and the "numerous issues" identified by the Planning Commission in its report. Although the less than unanimous recommendation, standing alone, could hardly support a denial of the application, the Planning Commission did identify a number of concerns with the proposal. Among those was that the city's comprehensive development plan seeks to avoid development creating a negative impact on the quality of residential life; that while it was common to have cell towers at school or government complexes, the nearby single family housing units on two sides of the tower "could provide reason to question compatibility"; that adverse impact "is usually associated with cell towers height and screening that are placed in residential neighborhoods," and the height of this tower makes it difficult to screen; and that the property value of the residential area could be a concern due to the tower. Dkt. 17-10. All of these are legitimate considerations under Bel Aire's zoning regulations. And although no specific evidence of impact on property values appears in the record (making it a doubtful basis for denying the application), there was substantial evidence supporting each of the other concerns identified by the Planning Commission.

Becker also cited the closeness of another cell tower and the "numerous other places northeast and west in town where an additional tower could be constructed without impacting an established residential neighborhood." Again, the impact of the proposed use on the character of the neighborhood and the zoning and uses of nearby properties are proper considerations under Bel Aire's zoning regulations, and there was substantial evidence in the record to support a finding that the proposed site would have an adverse impact on surrounding residential neighborhoods. Another reason identified by Becker was the lack of a stealth design. The zoning regulations encouraged the use of camouflaging and other stealth designs "as applicable to the type of telecommunications structure and character of the location," making this a legitimate consideration under the code. And while Stout expressed a willingness to change the color of the tower if requested, the court finds no specific evidence in the record regarding the feasibility of a stealth design, except perhaps for a general comment by its representative at one of the hearings that stealth designs could be costly. Given the state of the evidence, the council had a basis for concluding that the lack of a stealth design weighed against approval of the application.

Becker's final stated reason was that there was a lot of other property for sale as well as three water towers in town. Presumably she meant by this that the proposed site was unsuitable but there were suitable locations elsewhere in the city. For the reasons discussed above, the court finds that the council's conclusions about the unsuitability of the proposed site were based upon permissible factors under the zoning regulations and were supported by substantial evidence. As for Becker's suggestion about using a

water tower, this raises the question of whether it was feasible to use the nearby water tower within Stout's "search ring." Stout's justification statement said that using this 170-foot structure "would not allow for the lower parts of the tower to be marketed for colocation." That justification, which Stout's representative reiterated at the council hearing, was essentially non-responsive to whether it would be feasible to use the water tower to address the asserted gap in T-Mobile's coverage. Stout may have understandably preferred to construct a stand-alone tower that could be marketed to a number of providers, but the asserted justification for a special use permit to place this tower in a residential neighborhood was to remedy a gap in T-Mobile's coverage. Stout appears to have never answered the council's question of whether this asserted gap could be addressed by using the nearby water tower. Bel Aire's regulations require an applicant for a permit to provide an affidavit attesting that it made diligent efforts to co-locate on existing structures, and that the costs of doing so rendered it unreasonable or other limiting factors made it unsuitable. Dkt. 17-6 at 122. Stout's owner now provides an affidavit stating that the water tower was unsuitable, but nothing in the affidavit, in Stout's application, or in the statements of its representative have explained why the gap in T-Mobile coverage could not be remedied by using the water tower. In the absence of any evidence actually showing that the water tower was not suitable, the council could legitimately find that the availability of an existing structure for colocation weighed against approval of the special use permit.

Council member Martine, the third and final member to vote against Stout's application, did so according to the minutes because she "did not think this was a fit

place to put the cell tower," and because of the person who spoke out at the council meeting against the application. Martine also indicated that she felt based on the neighborhood survey by council members Becker and MacDonald that people were against the proposal. For the same reasons previously indicated, the court concludes that these were valid reasons under the city's zoning code and that they were supported by substantial evidence.

Stout takes issue with the city council's stated reasons for the denial, arguing among other things that council members denied the application because they wanted the tower located on city property. The court finds this argument unpersuasive. The fact that council members asked about whether the tower could be located on nearby city property or suggested that city property would be preferable does not demonstrate that this was the "true" motive for denying the application or that their stated reasons were pretextual or false. As the above discussion shows, the council cited valid considerations under Bel Aire zoning regulations and its decision was supported by substantial evidence. The record shows that the reasons cited by council members were in fact discussed in the course of hearings and were not after the fact rationalizations. The court will not presume that the reasons stated by the council were not the actual grounds for its decision. *U.S. Cellular Tel. of Greater Tulsa LLC v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1135 (10th Cir. 2003) (court will not assume the city acted in contravention of its obligation to provide reasons for the denial).

In sum, after reviewing the record, the court concludes that the city council discussed and cited reasons for its denial of Stout's application that were proper

considerations under the Bel Aire city code. Moreover, a reasonable mind could accept the evidence in the record as sufficient to support the conclusion that the special use application should be denied for those reasons. Accordingly, the court concludes that the council's decision was supported by substantial evidence in the record.

3. <u>Effective prohibition of personal wireless services</u>. Stout's final claim is that the denial of its application effectively prohibits the provision of personal wireless services. Some courts hold that a plaintiff asserting such a claim must show: (1) that the denial of the permit prevented a carrier from closing a significant gap in its existing services; and (2) that its proposed facility was the least intrusive means of doing so. *See AT&T Mobility Svcs., LLC v. Village of Corrales*, ___Fed.App'x ___, 2016 WL 873398 (10th Cir., Mar. 8, 2016) (citations omitted) (reviewing the elements as stated by the district court without deciding whether the Tenth Circuit would adopt those same elements). *See also T-Mobile Central, LLC v. Unif. Govt. of Wyandotte Cnty./Kansas City, Kan.*, 528 F.Supp.2d 1128, 1158-59 (D. Kan. 2007).

Stout has failed to establish either element of a prohibited services claim. Stout argues it showed a significant coverage gap through the affidavit of Guy Stout, who asserted that "radio frequency engineers determined that a significant 'gap' in wireless coverage for T-Mobile users existed in and around certain areas of Bel Aire," that Stout "proposed to construct … [the tower] to correct the significant gap," that "Stout determined that the water tower was not viable or suitable for co-location," and that the proposed site "is the least intrusive means of filling the significant gap…." Dkt. 24-1 at 4-5. As the court previously noted, however, this affidavit is entirely conclusory,

24

without any explanation or citation showing the basis for its conclusions. For example, the record contains no explanation whatsoever for how or why Stout determined that the asserted gap in coverage was "significant." *See AT&T Mobility Svcs.*, 2016 WL at *2-3 (considerations in determining whether coverage gap is significant include the gap's physical size and location, the number of affected customers, dropped-call or failure rates, and whether the purported gap affects a plaintiff's ability to provide outdoor, in-vehicle, and in-building coverage); *T-Mobile Central*, 528 F.Supp.2d at 1165 ("the relevant service gap must be truly 'significant' and 'not merely individual 'dead spots' with a greater service area.' Significant gap determinations are extremely fact-specific inquiries that defy any bright-line legal rule."). Stout never explained the extent of any gap or why the water tower could not be used to remedy it. Stout has the burden of demonstrating these assertions, and a conclusory affidavit declaring them to be true does not meet that burden.  *U.S. Cellular Corp. v. Bd. of Adjustment of City of Seminole, Okla.*, 180 F. App'x 791, 804 (10th Cir. 2006) (applicant failed to satisfactorily explain why alternative locations were insufficient).

Bel Aire was not obligated to retain its own expert to get a satisfactory explanation of these matters. *U.S. Cellular Tel. of Greater Tulsa*, 340 F.3d at 1137-38 ("[w]e doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower."). The city council questioned Stout about the asserted coverage gap and the possible use of the water tower but received no adequate response. As a result, the city council was entitled to take "the Missouri approach" and deny the cell phone tower application. *See Missouri Sec. of State website*,

www.sos.mo.gov/archives/history/slogan.asp (attributing to Willard Duncan Vandiver the comment that "frothy eloquence neither convinces me nor satisfies me. I am from Missouri. You have got to show me.").

**IT IS THEREFORE ORDERED** this 14th day of July, 2016, that Stout's Motion for Summary Judgment (Dkt. 23) is DENIED and City of Bel Aire's Motion for Summary Judgment (Dkt. 25) is GRANTED.

                        ____s/ J. Thomas Marten_____
                        J. THOMAS MARTEN, JUDGE